Good morning, ladies and gentlemen. We're here to hear arguments in United States v. Rothbard, and Mr. Garcia, you're welcome to proceed. The district court's sentence in this case was not procedurally sound and was substantially unreasonable. There's no confidence that the sentencing court fully considered the factors under 3553A. In fact, it gave little or no attention to the defendant's medical condition and why imprisonment in the Bureau of Prisons for 24 months was an effective and adequate sentence versus 24 months, for example, in a residential facility or on home detention. But it was very aware it was making that choice because that had been the recommendation of the probation people. And the district court said that his recidivism, particularly his commission of this while in probation, was so troubling that it didn't think that that proposed sentence was correct. And it also had the Harvey letter in front of it. So I don't know that it would be an odd standard for us in reviewing a sentence to think that that wasn't enough. I guess I'll just say that. Well, and I agree, obviously. The court did comment on the fact that the defendant had a period of recidivism. And also that the medical, it had before it and clearly relied on the statement from Dr. Harvey. Now, obviously, we've gone a step beyond that at the moment. But it knew that the position of the BOP was that they could handle this imatinib-resistant leukemia. I agree, Your Honor. However, I don't believe the court fully explained why a sentence for the same amount of time in the residential facility or even on home detention was not fully adequate. Well, it said, I mean, it certainly talked about that. It said that it thought that he hadn't gotten the message and that, in fact, he had committed his second round of fraudulent activity while he was ill just as, you know, while he was on probation. And we would submit, Your Honor, that that wasn't enough, particularly when you look at the way- What do you think? Dictate to me what you think he should have said. That would be helpful. Well, I think because of the lack of information in the record about the medical condition and the lack of explanation for why this particular defendant with this particular medical condition and the uncertainties at the time about how the BOP would treat him or provide the drug wasn't adequate. Well, but you haven't told me what you think he should have said. Yeah, I think he should have evaluated the medical information before the court and fully developed whether or not the Bureau of Prisons could and will provide that medicine and the time in which it will provide that medicine to Mr. Rothbard. I don't really know what else the BOP could say unless you are proposing that, at least for people with a certain seriousness of medical condition, there needs to be some sort of medical evaluation before a sentence of incarceration can be pronounced. Well, of course the guidelines provide that a person who is seriously infirm, and in this case someone like Mr. Rothbard, can be placed in just as effective imprisonment in a residential facility. I know, but I'm just thinking procedurally. If your rule is correct and it's an abuse of discretion sort of thing that should override sentencing guidelines to put somebody, let's say, with as serious a medical condition as Mr. Rothbard has under sentence of incarceration, then it seems to me the logical corollary to that is what the government has suggested, that there really almost is a matter of, I don't know what, some sort of law, I can't believe constitutional law, that they have to be evaluated before the court pronounces sentence. And I don't know of any such rule, and the BOP has represented that it will act promptly, that it has ten times provided this drug, that the money hasn't stopped it. Well, I think like Judge Posner raised at our last argument on the motion to stay, the record really doesn't answer much, and even the subsequent information that the government has provided in its appellee's reply brief doesn't answer much. I think there's still too much speculation. But how can the government pre-commit? Maybe you're confident that your client would pass the test. I don't know why you wouldn't, actually, myself, since there doesn't seem to be any other drug that treats this other than a couple of things, the Dazatinib and the Panatinib, which are just as expensive. So you may be in a situation where this is going to be fine, but a lot of people will need to have some sort of government evaluation, and for the government to pre-commit signing in blood that it's going to give this drug seems to me not a burden that it has. Well, of course, it creates the situation if it's not going to provide some sort of adequate assurance, then we're in a situation where perhaps a defendant like Mr. Rothbard, who's placed in prison, is suffering unfairly, and we start to get into a situation. Why couldn't you zip in with a TRO four days later after he doesn't get, I mean, in your hypothetical, that he doesn't get it? Well, then we're, of course, at the liberty of the district court to set a hearing, grant that hearing, and we don't know how long it will take. Not for a TRO. I mean, that would be for temporary relief immediately to preserve the status quo, irreparable harm, et cetera. I guess when we look at this particular case, we don't feel like enough was done to allow this court to discern whether or not the district court fully considered the impact to this particular defendant. Now, are you suggesting we should disregard this additional information that we requested? No, but I don't think that additional information that you requested, and that was attempted to be provided by the government, gets us really any farther than we were before. You know, yeah, they say we've provided an inalternative ten times, but they don't give us any facts or circumstances behind that. Was this as a result of appeal, and was it given six months later? I mean, they acknowledge they don't know how long it takes to provide this. Was it the probation service that recommended, what, was it 12 months of home confinement and 12 months in a halfway house? Correct, Your Honor. That was the probation service? That is correct. And we think that not a lot of weight was given to that recommendation by the probation service. What was the judge's reason for rejecting that? I believe the only comment was, in 24 years, he, maybe I'm getting that wrong, I'm sorry. In all of his life as a judge, he had never given a probation sentence for a similar defendant in white-collar crime. Why not? He doesn't fully explain, and that's the problem. He doesn't fully explain. Just describing his personal history or something? He doesn't explain. He says, I've never given probation in white-collar crime cases. So, thus, I think it would be a disparate treatment. He's never given probation? I'm sorry? He's never given probation in a? That's what he says on the record, and, of course, I don't. I think that's not a fair description of what he said. He's concerned about the nature of Rothbard's crime. I'm looking at page 8 of the government's brief, where he says it's a crime of pure greed. You haven't had a good history here recently, Mr. Rothbard. You committed this while you were on probation. What's the lesson you've learned? Doesn't think probation is the appropriate sentence, considering he was already on probation at the time he committed this offense. Then he says something about health. He emphasizes to BOP that he's got the leukemia and risk of remission. So I don't think you're fairly describing what the district court said. I direct the court to page? But he'd spent two and a half years out without committing any crimes, hadn't he? Correct. We're going on three years now. The judge didn't give any weight to that. Correct, Judge Posner. And, Judge Wood, I would direct your attention to page 48 of the transcript, where the court says it never really considered probation here. He hasn't done that in 26 years of sentencing for people of these types of crimes. And to do that would be an unwarranted sentence disparity. So I think he kind of walked into this sentencing thinking, I've never given probation before. I'm not going to give it now. And really, quite frankly, we're not asking for probation. We're not asking that there not be any form of imprisonment. Our issue is with the placement of that imprisonment. No, being in a halfway house or at home is quite different from being even at Butner. I mean, it's a big difference that you're asking for. It is a big difference, but I don't know that it amounts to any more deterrence to this individual or any other individual. Well, wasn't that for the – are we supposed to just re-sentence? No, I think the court should send the case back for re-sentencing so that these issues could be more fully developed. Is that what you're asking for, re-sentencing? Yes, Your Honor. Is it more costly for the government to have someone in prison or someone in home confinement and the halfway house? More costly in prison, Your Honor, because the defendant, unless he's indigent, is responsible for paying the costs of his home detention. And in this case, he would obviously continue to pay the cost of his medical care. Well, the government is paying for that, as they point out, either way because he's on medical assistance. Well, and we take some exception to that. He's still paying a premium for that plan. That plan is offered through the exchange. They may have a short half-life. We'll have to see. Sure. I see my time's up. All right. I'll give you a minute if you need it to rebut. Thank you. Okay, sure. Mr. Shepard. Thank you, Your Honors. If it please the court, we disagree. We think that the district court did not abuse its discretion when it sentenced the defendant to a lowing guideline sentence. Is the Bureau of Prisons under the Attorney General? It is, Your Honor. When it sentenced the defendant to a lowing guideline sentence of 24 months. Is there any reason to be concerned about the district judge's comment that he doesn't believe? Well, if you read it the way Mr. Garcia is reading it, that he doesn't think that incarceration outside the walls of a prison or detainment, I should say, maybe home confinement, halfway houses, are an effective deterrent for people such as Mr. Rothbard. If that is the way you read it, certainly it is concerning. I don't believe that is the way that that statement should be read. I was at the sentencing hearing for its entirety. Well, what's your alternative reading? I believe that that comes at the conclusion of a long deliberation that the district court did. It stated it multiple times throughout the sentencing hearing, not only about the recidivism, but a lot about Mr. Rothbard's medical condition. He talks about the fact that he had read the memos. At one point, he even states that the defense's sentencing brief was very thorough. He spent time talking about . . . I don't believe that he felt that that, compared with what was before him, the entirety of the record was enough to mitigate against the finding of prison. I would also note, although that the district court didn't explicitly say this . . . Why didn't he listen to . . . what? The probation office surely knows more about criminals and alternative punishments and so on than a district judge. Don't bite on that one, friend. I would, as Judge Brower says, I would disagree with that. Really? I would. I think that the district court, especially a district court judge like Judge Young . . . The entire business of probation officers is dealing with people who commit crimes, suspected this, prosecuted, and they have to suggest sentences and so on. I think the probation office is very knowledgeable about this. They may be knowledgeable, Your Honor, but I don't know that it's more knowledgeable than Judge Young, who has been a federal district court judge for quite a number of years. He's sentenced and evaluated a number of criminal defendants, both white collar, violent, and everything in between. Judge Young has certainly adequate enough experience, and he's seen the defendants when they're placed under probation or supervised release, when they reoffend and they come back. So these are all the knowledge base that the district court judge has. Essentially, the probation officer looks into the background. That's correct. People he worked with and Henry adds that all up and comes to a personal conclusion. The sentencing obligation is that of the judge, is it not? Absolutely, Your Honor. Either the probation office or the judge has to sentence, and guess who wins? The judge, every time. And in this case? You've probably seen judges disagree with recommendations from the probation office. On a number of different times. Usually it's the other way around. The probation office recommends a sentence of imprisonment or a guideline sentence, and the district judge goes down. In this case, the district judge felt that the sentencing guidelines were appropriate, and why it reached this was it looked at all the information, and it was clear to the record and to anyone who was there, the district court took very seriously the medical condition of the defendant, as did everyone who was there. Well, I'm made uncomfortable by Harvey's letter, Dr. Harvey's letter, and the way it ends. It says basically they're going to consider whether to continue his nylotinib. I mean, I think that that's the best that the doctor could do in the position that he was in. Could you speak up, please? Certainly. Could you speak louder? If you read the letter as a whole, which I think that you can't parse individual paragraphs, if you read the record as a whole, what Dr. Harvey was stating is, excuse me, Mr. Rothbard's medical condition had been evaluated. Based upon that evaluation, it was similar to it required a drug that had been provided in the past for conditions very similar to Mr. Rothbard's. Why didn't Dr. Harvey say that the prison will provide him with his nylotinib? Again, as the court has already put out, the Bureau of Prisons has to be able to do their own evaluation. If for no other reason just to confirm. I'm sorry to interrupt you, but suppose the letter had said something like, if upon intake we conclude that he does indeed have this nylotinib-resistant disease, then we agree that nylotinib is the correct medication for it and we would continue. Something a little bit more like that. I mean, they certainly do have to make sure that they're not dealing with some charlatan doctor on the outside or some other problem, even a doctor who signs off on things without perhaps as much care as that doctor ought to. And I have no reason to think Dr. Kripes is such a doctor, none at all, but they're out there and we see them sometimes. So I can imagine that Dr. Harvey couldn't just pre-commit, but that he could say, if this checks out, then he gets the nylotinib. Maybe he could, maybe he couldn't. I think he got as close to that as he probably was allowed to, and I think that the subsequent information requested by this Court has borne that out. Did Harvey examine him? He did not examine him, Your Honor. I don't understand why, if you have someone who obviously has medical problems, why he wouldn't be examined before he was sentenced? There's no procedure for that in place. No procedure? Oh, come on. Bureau of Prisons can't do that? Not under this, under the current structure. Why not? I don't understand. Why doesn't the judge say, go find, you know, go have him examined by a reputable doctor who's an expert in leukemia and so on? But then where does that end? Does every defendant get that? Pardon? Does every defendant get that? No, just the ones who have serious illness. Well, how do we start defining what is a serious illness? Well, you know he had, everyone knows he has a serious illness. But the case here is bigger than Mr. Rothbard, particularly this aspect is bigger than Mr. Rothbard. What do you mean the case is bigger than Rothbard? Other people, a healthy, you don't have to worry about it. When you have someone who's as ill as this with his nilatin and so on, why don't you have him examined? I would think that would be very material to this sentence. I think that as we have done it essentially for forever, the procedures in place are adequate. But it doesn't sound right for people like this. It doesn't sound sensible. It sounds sensible in the fact that he provided his records. The records were evaluated. There was an informed opinion based upon past practices by the BOP that if these records are found, of course, to be accurate, this is what has happened. To hold a higher standard would require either extended periods of the pre-sentence report. It could potentially require new contracts going through GSA to come up with approved providers from the BOP to do these evaluations. It would provide extended litigation as to what constitutes a terminally ill diagnosis, what doesn't, what is serious enough. And that's just not something that the government feels is warranted. The procedures in place are adequate. So you put him in prison and nobody knows what kind of medical care he's going to receive. Your Honor, I think if we look at this, this isn't existing in a vacuum. The Bureau of Prisons is well aware. Well, he's been signed to Butner, you said. That's correct, Your Honor. Which is the government's premier medical facility, I understand, for BOP. Not only that, it is the facility where Dr. Harvey has his own home base. Dr. Harvey, who is more than acquainted with Mr. Rothbard and his medical condition. They put him in Butner. They stayed in all 10 times with an identical condition. It was prescribed. There's the continuity of care program in place. There's the expedited review. There's no reason to believe, based upon the record before it, that he is not going to get adequate care. What's the alternative to nilotinib? There were two others, but they've been indicated that they were. Pardon? There were two others cited by, I believe it was Dr. Cripe. I don't have those names in front of me, but he indicated that they were not adequate for his. Well, I thought the point is more, they're dasatinib and panatinib, according to Dr. Cripe. And neither one of those is on the formulary either, and they're both at least as expensive as nilotinib, if not more. Correct. So there's no expense difference and there's no formulary difference. Versus, I can't pronounce it, nilotinib, I believe. There's no incentive for the BOP to do that. I see that my time is up. If there are any other questions, I can answer them. Otherwise, the government rests on its brief and argument. Okay, apparently not. Thank you very much. Would you like to wrap up for a minute, Mr. Garcia? Just a point of order. After Mr. Rothbard was designated to Butner and this court granted the stay, the Bureau of Prisons notified him, or me actually, that he would have to be redesignated once a final decision from the court comes down. So while he was originally designated to Butner, because of the time, they don't hold that bed forever. We don't know where he will be redesignated if the court upholds the sentence. Well, you wouldn't know if he were sentenced anyway. They could move him to any other place they wanted to. Correct. So you're not looking for any guarantees of a particular place where he should be taken care of? There is no guarantee. Correct. But I take it he's lived successfully on the outside with the nilotinib, so once he's got the prescription, maybe he doesn't need the Butner facilities. Only if the facility that he goes to obviously approves and will provide that drug. Well, it's BOP who provides it. It's not facility by facility. That's unclear. I don't know. I mean, I think the whole issue that we have here is, and this court tried to get this information at our last hearing, the district court didn't have all of the information it needed to make the decision, didn't fully discern that information, and didn't tell us why choosing a sentence of 24 months in the Bureau of Prisons was sufficient and effective versus the residential facility. I think we have your point. Thank you very much. The case will be taken under advisement. The court will be in recess.